Staples, J.,
delivered the opinion of the court.
In considering this case, it is important to bear in mind the rules of law governing judicial sales. All the authorities agree there is a wide distinction be *815 'tween an application to set aside a sale after it is approved by the court, and an application to withhold a confirmation. A decree of confirmation is a of the court, which determines the rights of the parties. Such a decree possesses the same force and effeet of any other adjudication by a court of competent jurisdiction. But before confirmation the whole proceeding is in fieri, and under the control of the court. Until then, the accepted bidder is not regarded as a purchaser. His contract is incomplete, and he acquires by his bid no independent right to have it perfected.
According to the English practice, the preferred bidder is never entitled to the benefit of his purchase till the master’s report of the bidding is confirmed by the court. He is not liable to any loss by fire or otherwise, which may happen to the premises, nor is he entitled to the benefit of any appreciation of the estate by the accidental falling in of lives or other means. Until confirmation, the purchaser is not compelled to complete his purchase, nor is he entitled to the possession of the estate.
It is not material to inquire how far these rules of the English courts prevail in this state. It is very certain that with us the commissioner conducting a sale is regarded merely as the agent or servant of the court," and his proceedings are necessarily subject to its revision and control.
Whether the court will confirm the sale, must in great measure depend upon the circumstances of each particular case. It is difficult to lay down any rule applicable to all cases; nor is it possible to specify all the grounds which will justify the court in withholding its approval. If there is reason to believe that fraud or mistake has been committed to the detriment of the •owner or the purchaser, on that the officer conducting *816 the sale has been guilty of any wrong or breach of' duty to the injury of the parties interested, the court withhold a confirmation. Either party may object to the report, and the purchaser himself, who becomes a party to the sale, may appear before the court and have any mistake corrected.
The court, however, in acting upon a report of sale, does not exercise an arbitrary but a sound legal discretion in view of all the circumstances. It is to he exercised in the interests of fairness, prudence, and with a just regard to the rights of all concerned. See Taylor v. Cooper, 10 Leigh 317; Daniel v. Leitch, 13 Gratt. 195, 211, 214; Blossom v. Railroad Company, 3 Wall. U. S. R. 205, 6, 7; Rover on Judicial Sales, and cases cited at pages 30, 55, 56.
There is another rule which may be noticed in this connection, ifo -person employed or concerned in selling at a judicial sale is permitted to become a purchaser, or even to act as agent of a purchaser. It is impossible with good faith to combine the inconsistent capacities of seller and buyer, crier and bidder, in one and the same transaction. If the commissioner or auctioneer faithfully discharges his duties, he will, of course, honestly obtain the best price he can for the property. On the other hand, if he undertakes to become the purchaser for himself, or for another, his interest and his duty alike prompt him to obtain the property upon the most advantageous terms. There is an irreconcilable conflict between the two positions. And so the courts have always held. Rover on Judicial Sales, 30.
In the case before us the auctioneer (Moore) in acting as agent for the appellant, therefore clearly violated bis duty. In doing so he was not influenced by anything said or done by the appellant. The latter not *817 being able to attend the sale, requested a friend to bid for him. The auctioneer then volunteered to act for the appellant. The appellant said he only desired to purchase a part of the tract; he was willing to pay forty-five dollars per acre for that part, and he did not care who made the bids. As this was a distinct specific offer for the part named, there would have been no great impropriety in the auctioneer in declaring and accepting it on the day of sale. But the auctioneer claims that he was clothed with an unlimited authority, if part could not be so purchased, to bid for the entire tract at such sum as he might in his discretion think proper to give. This is denied by the appellant; and in this denial I think he is sustained by the facts. This departure from the plain line of his duty throws suspicion, if not discredit, upon the conduct of the auctioneer throughout.
"When the sale commenced there was a single bid of ten dollars per acre. The next bid was by the auctioneer for the appellant, of twenty-five dollars per acre, an advance of fifteen dollars per acre upon a single bid. At this point the bidding ceased; at least no one seemed inclined to offer more. The auctioneer then approached the appellee, John Harper Bice, and asked him why he did not hid, saying “ mine is a bona fide bid, and I am not going to stop at this.”
The object of this communication is plain enough. It was to induce the owner to run up the property upon the appellant, whom the auctioneer was professing to represent. It is my bid—and I shall continue to bid— you may therefore safely become a bidder, is the intimation to the appellee. This declaration was not made publicly, but privately to a party at whose instance and for whose exclusive benefit the sale was made; who was a gainer by every dollar added to the *818 purchase money; and who is now insisting upon a confirmation of the sale. And what is more than all, it was made to one who if not insolvent at the time, was certainly in no condition to become a purchaser. Testimony has been adduced with a view to show that Rice might have raised the means to pay for the .property. This testimony does not deserve serious consideration. The charges upon the property scarce exceeded three thousand dollars. This comparatively small sum Rice was unable to raise, and he was compelled to resort to a court of equity for a sale of the property to discharge his liabilities. We are now asked to believe he could have met a cash payment of more than four thousand dollars; and that he could have given personal security to the amount of the first two bonds, being more than six thousand dollars. I do not attach any importance to any advantage he could have derived from his life estate. His life interest in the land was subject to the charges already alluded to, and his life interest in the proceeds of sale was of course bound to the same extent. As to his giving personal security, such an idea is contradicted by the whole record. Looking to all the facts, it is difficult to believe that Rice could seriously have entertained the idea of becoming the purchaser. His conduct on the day of the sale tends strongly to show that he had but little thought of bidding until approached by the auctioneer. When the property was crying at the small sum of twenty-five dollars, he enquired of a friend, what he should do; and the latter being no doubt acquainted with his circumstances, told him “to do nothing.” This advice he seems to have followed. But when the auctioneer informed him that the bid of twenty-five dollars was his, (the auctioneer’s) and that he did not intend to stop at that, all difficulty on the *819 part of Rice seems at once to have been removed; he at once began to bid, and he and the auctioneer between them, in a short time run the price up to more than sixteen thousand dollars; three thousand dollars more than the former owner had estimated it, and more than two thousand dollars in excess of the estimate of any disinterested witness. Rice having bid thirty-five dollars, no doubt at once perceived he had far exceeded every just and reasonable limit; he was permitted to withdraw his bid, -and in a few moments the property was knocked down to the appellant at thirty-four dollars and fifty cents.
It is not extravagant to assert that Rice must have been satisfied that the auctioneer was not bidding for himself, but for some person not present; and the auctioneer must have been equally well satisfied, that Rice was not bidding with any viéw to an actual purchase of the property. The bystanders no doubt thoroughly comprehended the whole situation—the auctioneer and one of the parties chiefly interested, the only competitors.
It is not surprising that there was no bid for the property after the first, by any other person. It is very true that both Rice and the auctioneer deny there was any arrangement or understanding between them with respect to the bidding; and we are not disposed to impeach their testimony in this particular. But it is undeniable that each must have fully comprehended the entire situation: lies ipsa loquitur. Rice certainly well understood that acting under the auctioneer’s invitation, and aided by his connivance, he was creating a factitious competition at the expense of the appellant. It is impossible that a sale thus made can receive the sanction of a court of equity. The conduct of Rice precludes him from insisting upon a confirmation. *820 That is very clear. The other parties, the remainder-men, stand in no better situation, They cannot enforce contract made by their agent, the auctioneer, and at the same time evade all responsibility for his conduct in making the contract. They are equally affected by the misconduct of Rice with whom they have certain interests in common. If the purchase is confirmed as to them it must necessarily be confirmed as to him also. A contract entire and indivisible, if vacated at all must of course be vacated in toto. More especially is this true when the rescission is owing to one of the parties through whose agency the contract was made.
It has been said, however, that the appellant ratified the sale after it was made. A satisfactory answer to this is, that at the time of the supposed ratification the appellant could not have known of the existence of the facts in respect to the conduct of Rice and the auctioneer at the sale. It is very probable that he was not apprized of them until they were brought out on the examination of the witnesses, or at least a short time before that testimony was taken. The ratification of course amounts to nothing unless made with an understanding of all the material facts and circumstances attending the sale.
Before concluding this opinion it is proper to advert very briefly to other matters having some connection with what has been said. In the first place it is very questionable whether the appellant ever authorized Moore, the auctioneer, to bid for the whole tract of land. He certainly did empower him to purchase a part of the tract designated; but the appellant was very careful to limit the price, a price he was willing to give at a public or private sale. The appellant had not even looked at the other part of the tract. He had declared he would not buy it on any terms. It is *821 almost incredible that he would under such circumstances, empower this auctioneer, the agent of the seller, to buy the entire tract at any price the might choose to give. The story is so absolutely improbable it ought to be supported by very clear and satisfactory evidence. If the decision rested alone upon this point, there would be no serious difficulty in declaring that the auctioneer had exceeded his authority, and the appellant is not bound by his action. But the appellees rely upon the fact that the appellant was informed of the purchase of the whole tract, and deliberately ratified the same. On the other hand the appellant affirms that at the time he signed the memorandum he was so deeply intoxicated he was not conscious of the character of the paper he was signing. He supposed he was simply ratifying the purchase of the part he had designated.
It must be premised that the courts always listen with suspicion and reluctance to any defence founded upon an alleged voluntary intoxication. Here, however, the question is not upon the avoidance of a contract made by the party himself; but upon the ratification of an unauthorized act of another, by which the supposed principal is involved in a very heavy liability. If the appellant honestly believed he had only authorized the purchase of a part of the tract, he would naturally believe that such part only had been purchased, and he might as reasonably conclude, when called on by the commissioner to sign the memorandum of sale, that it related only to that part. This would be peculiarly so if the appellant at the time, from any cause, was not in complete possession of his mental faculties.
Upon the question of the appellant’s drunkenness the evidence is very conflicting. But it cannot be denied *822 that the great preponderance of testimony strongly sus~ tains the view that the appellant at the time of signing paper was too deeply intoxicated to have a clear comprehension of the nature and effect of the act he was doing. Yery great weight is certainly due to the testimony of the distinguished gentleman who acted as one of the commissioners of sale on that occasion. But it detracts somewhat from the force of that testimony, that the witness was, previous to that day, a total stranger to the appellant, and therefore not so well qualified to judge of his capacity as others who. knew him more intimately. However that may be, there are numerous witnesses who testify with great minuteness to facts which outweigh any mere opinions formed from a few moments observation. But while the appellant was evidently much under the influence of liquor at the time, that of itself would not be sufficient to prevent a confirmation of the sale. But his condition at the time of the supposed confirmation, considered in connection with all the circumstances surrounding the sale, exhibit such a case of mistake,, surprise, unconscionable advantage and injustice as calls for a rescission of the contract. In ariving at this conclusion we are not to be understood as impeaching in the slightest degree, the conduct of the commissioners condncting the sale. There is nothing in the record tending to show even a shade of suspicion upon the perfect fairness and integrity of their conduct.
Upon the whole we are of opinion the decree of the circuit court must be reversed, the sale set aside, the rule awarded against the appellant discharged, and the cause remanded for further proceedings.
The decree was as follows:
*823 This day came again the parties by counsel, and the court having maturely considered the transcript of the record of the decree aforesaid, and the ments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the circuit court erred in confirming the sale made by conimissioners Bird and Walton on the 23rd day of May 1874, to the appellant John P. Brock. It is therefore decreed and ordered, that the decree of the said circuit court confirming said sale, be reversed and annulled; and that the appellee, John Harper Bice, do pay to the appellant, John P. Brock, his costs by him expended in the prosecution of his appeal aforesaid here.
And this court proceeding to render such decree as the said circuit court ought to have rendered, it is decreed and ordered, that said sale be and the same is, hereby annulled; that the rule awarded against the said John P. Brock on the 25th day of August 1874, be discharged, and that the appellee, John Harper Bice, do pay to the said Brock his costs by him expended in his defence to said rule. And it is further ordered that this cause be remanded to the said circuit court for such further proceedings as the parties interested may be advised to take with reference to a sale of the property in the bill and proceedings mentioned.
Which is ordered to be certified to the said circuit court of Shenandoah county.
Decebe eeveesed.